**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

**CECILE HAHN,**

      **Plaintiff,**

**v.**

**THE REALREAL, INC.; JULIE**
**WAINWRIGHT,**

      **Defendants**

Civ. No. 18-5030

**OPINION**

    This matter comes before the Court on the motion (DE 70) of Defendants The RealReal, Inc. and Julie Wainwright (collectively, "Defendants") to dismiss the Complaint and compel arbitration and Defendants' motion (DE 71) for summary judgment. For the following reasons, both motions are **DENIED**.

1

## I.   Background[1]

In 2011, Defendant Julie Wainwright founded The RealReal, a consignment business selling luxury items such as designer clothing, handbags, and jewelry. She serves as the company's Chief Executive Officer and Chairwoman of the Board. (D SOMF ¶ 1.) Plaintiff Cecile Hahn was hired by The RealReal in July 2015 and subsequently became a Human Resources ("HR") Manager at The RealReal's Secaucus, New Jersey warehouse. (D SOMF ¶ 2.) Hahn was terminated approximately two years after being hired, when she was 47 years old. (D SOMF ¶ 2.) Asserting that her termination was the result

---

[1]   For ease of reference, certain key items from the record will be abbreviated as follows:

| | | |
|---|---|---|
| "DE_" | = | Docket Entry in this Case |
| "Compl." | = | Complaint (DE 1, Ex. A) |
| "D SOMF" | = | Defendants' Statement of Material Facts (DE 71-2) |
| "P SOMF" | = | Plaintiff's Statement of Material Facts (DE 78-2) |
| "Def. MTD Brf." | = | Defendants' Corrected Brief in Support of Motion to Dismiss (DE 76) |
| "Def. SJ Brf." | = | Defendants' Brief in Support of Motion for Summary Judgment (DE 71-1) |
| "Pl. MTD Brf." | = | Plaintiff's Brief in Opposition to Motion to Dismiss (DE 77) |
| "Pl. SJ Brf." | = | Plaintiff's Brief in Opposition to Motion for Summary Judgment (DE 78) |
| "Def. MTD Reply" | = | Defendants' Reply Brief in Support of Motion to Dismiss (DE 84) |
| "Def. SJ Reply" | = | Defendants' Reply Brief in Support of Motion for Summary Judgment (DE 85) |

of age discrimination, Hahn brings this action under the New Jersey Law Against Discrimination against The RealReal and Wainwright. (P SOMF ¶ 33.)

When Hahn was hired, she signed an offer letter containing a mandatory arbitration provision:

> **Dispute Resolution through Individual Arbitration**. Both you and the Company agree to arbitrate all disputes arising out of; or related to your employment with the Company, the termination thereof, or this or any other agreement between you and the Company. Without limiting the foregoing, this agreement to arbitrate disputes encompasses every claim regarding your employment with the Company, including any claims of unlawful discrimination, harassment or retaliation in employment, whether under federal, state or local law, except that you shall not be required to arbitrate any statutory claim that is not arbitrable according to the terms of the relevant statute, such as whistleblower claims under the Dodd-Frank Wall Street Reform and Consumer Protection Act. Such arbitration shall take place before JAMS in New York New York and shall be conducted pursuant to the then-current JAMS Rules for the Arbitration of Employment Disputes. The award of the arbitrators shall be final and judgment upon such award may be entered in any court of competent jurisdiction. Notwithstanding the foregoing, you agree that the Firm may seek injunctive or other provisional relief from any court of competent jurisdiction.

> You expressly acknowledge and agree that this agreement to arbitrate, on an individual basis, any such dispute between you and the Company precludes your participation, in any class action, collective action, or other representative action or proceeding. Consistent with the National Labor Relations Act, the Company will not retaliate against any employee joining a class or collective action, but may seek to enforce this agreement to arbitrate claims on an individual basis and dismiss any claims brought in violation of this agreement to arbitrate.

> This agreement does not prohibit you from pursuing an administrative claim with a local, state or federal administrative body such as the Equal Employment Opportunity Commission or the Workers' Compensation Board. This agreement does, however, preclude you from pursuing a court action regarding any such claim.

(Patterson Aff. Exh. C.)

Plaintiff filed this action in state court on February 18, 2018. Defendants then removed the case to this Court and filed an Answer, which did not raise arbitration as an affirmative defense. The parties exchanged initial disclosures, served and responded to discovery requests, and began depositions. Defendants took Hahn's deposition in November of 2019, and four other depositions have taken place in this case. (DE 77-2 ("Castronovo Cert.") at 7.) There have also been three case management conferences and four scheduling orders.

On January 9, 2020, Defendants first sought leave from the Court to file a motion to compel arbitration. (DE 35). On January 31, 2020, Judge Hammer issued an Order denying Defendants' motion to compel arbitration without prejudice to the filing of such motion together with a motion for summary judgment upon the completion of fact discovery. (DE 37.) Now before the Court are two motions filed by Defendants: (1) a motion to compel arbitration and dismiss the case; and (2) a motion for summary judgment.

## II.    Motion to Compel Arbitration

### a.  Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, creates a strong federal policy in favor of arbitration. *See Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 178–79 (3d Cir. 1999) (noting that FAA "creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes."). The Act authorizes a party to enforce a valid arbitration agreement by moving to compel arbitration. 9 U.S.C. §§ 2-4; *In re Pharmacy Benefit Managers Antitrust Litig.*, 700 F.3d 109, 116 (3d Cir. 2012).

Arbitration is a matter of contract between parties, so a judicial mandate to arbitrate must be predicated on the parties' consent. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 771 (3d Cir. 2013) (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980)). When a district court is presented with a motion to compel arbitration, the

Court must (a) determine whether the agreement to arbitrate is valid, and then (b) decide whether the dispute falls within the agreement's scope. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009).

"[W]hen it is clear on the face of the complaint [or documents relied upon by the complaint] that a validly formed and enforceable arbitration agreement exists and a party's claim is subject to that agreement, a district court must compel arbitration under a Rule 12(b)(6) pleading standard . . . ." *MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 406 (3d Cir. 2020). But if (1) the materials subject to review on a Rule 12(b)(6) motion are unclear as to the arbitrability question, or (2) the parties have come forward with facts putting the arbitrability question at issue, then the court may order limited discovery and then consider the arbitrability question on a summary judgment standard. *Guidotti v. Legal Helpers Debt Resol.*, LLC, 716 F.3d 764, 774 (3d Cir. 2013) (quotation marks and citation omitted).

### b. Waiver

Defendants argue that the Complaint should be dismissed because the dispute is subject to arbitration pursuant to an agreement signed by Hahn when she was hired in 2015. Hahn responds that Defendants have waived arbitration by litigating this matter in court for two years before seeking to move to compel arbitration. Because I find that Defendants have waived arbitration, I do not reach the parties' arguments as to the validity of the arbitration agreement itself.

The Third Circuit has explained that, "[c]onsistent with the strong preference for arbitration in federal courts, waiver is not to be lightly inferred, and waiver will normally be found only where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery." *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 208 (3d Cir. 2010) (quoting *PaineWebber Inc. v. Faragalli*, 61 F.3d 1063, 1068–69 (3d Cir. 1995). Still, "a court may refuse to enforce an arbitration agreement where, for example, 'the alleged defaulting party has acted inconsistently with the right to

arbitrate,'" *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 981 (2d Cir.1996) (quoting *St. Mary's Medical Ctr. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 588 (7th Cir. 1992)). Further, the Court "will not hesitate to hold that the right to arbitrate has been waived where a sufficient showing of has been made by the party seeking to avoid arbitration." *Ehleiter v. Grapetree Shores*, Inc., 482 F.3d 207, 223 (3d Cir. 2007) (internal quotations and citations omitted).

"[P]rejudice is the touchstone" in determining whether there has been a waiver via litigation conduct. *Id.* at 222. In *Hoxworth v. Blinder, Robinson & Co., Inc.*, the Third Circuit has explained that the necessary showing of prejudice may be eased where substantial pretrial proceedings have occurred:

> [W]here a party fails to demand arbitration during pretrial proceedings, and, in the meantime, engages in pretrial activity inconsistent with an intent to arbitrate, the party later opposing arbitration may more easily show that its position has been compromised, *i.e.*, prejudiced, because under these circumstances we can readily infer that the party claiming waiver has already invested considerable time and expense in litigating the case in court, and would be required to duplicate its efforts, to at least some degree, if the case were now to proceed in the arbitral forum. Prejudice of this sort is not mitigated by the absence of substantive prejudice to the legal position of the party claiming waiver.

980 F.2d 912, 926 (3d Cir. 1992).

*Hoxworth* set forth six nonexclusive factors relevant to the prejudice inquiry:

> [1] the timeliness or lack thereof of a motion to arbitrate . . . ;

> [2] the degree to which the party seeking to compel arbitration has contested the merits of its opponent's claims;

> [3] whether that party has informed its adversary of the intention to seek arbitration even if it has not yet filed a motion to stay the district court proceedings;

> [4] the extent of its non-merits motion practice;

> [5] its assent to the court's pretrial orders; and

> [6] the extent to which both parties have engaged in discovery.

980 F.2d at 926–27 (internal citations omitted). Not all six factors need to be present to justify a finding of waiver. *Nino*, 609 F.3d at 209. I nevertheless consider each of them.

### i.    Timeliness

When a party's motion to compel arbitration occurs in a reasonably timely fashion, this factor weighs against waiver. *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 598 (3d Cir. 2004) (38 days); *PaineWebber Inc. v. Faragalli*, 61 F.3d 1063, 10669 (3d Cir. 1995) (two months); *Wood v. Prudential Ins. Co. of Am.*, 207 F.3d 674, 680 (3d Cir. 2000) (one-and-a-half months); *Gavlik Constr. Co. v. H.F. Campbell Co.*, 526 F.2d 777, 783–84 (3d Cir. 1975) (immediately after removal to federal court). Where, on the other hand, a motion to compel arbitration is significantly delayed, the Third Circuit has found a waiver. *In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d 109, 113 (3d Cir. 2012) (ten months); *Gray Holdco, Inc. v. Cassady*, 654 F.3d 444, 454 (3d Cir. 2011) (ten months); *Hoxworth*, 980 F.2d at 925 (11 months); *Nino*, 609 F.3d at 210 (15 months); *Ehleiter*, 482 F.3d at 223 (four years). The court may consider not just the length of the delay, but whether there is a satisfactory explanation for it. *See In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d at 118.

The relevant date for this analysis is January 9, 2020, when Defendants first sought leave from the Court to file a motion to compel arbitration.[2] (DE 35.) The Complaint was filed on March 3, 2018, and Defendants removed the case to this Court on March 30, 2018. (DE 1; DE 70.) Taking the most defendant-favorable approach to the calculation, almost two years elapsed before Defendants first invoked the arbitration clause.

---

[2]  It is true that this motion to compel was not filed until February 16, 2021, but the lapse in time is not properly attributed to the Defendants. Defendants were required to, and did, apply to the Magistrate Judge on January 9, 2020, for leave to file the motion to compel, in compliance with the Court's pretrial scheduling order. (DE 10) Magistrate Judge Hammer denied Defendants' application to file a motion to compel arbitration, without prejudice to their right to file the motion upon completion of fact discovery, in coordination with a motion for summary judgment. (DE 37).

Defendants point out that Plaintiff's counsel was apprised as early as October 2018 that Defendants "believed Plaintiff's claims were arbitrable." (Def. Reply at Ex. B; *see also* Section b.iii, *infra*.) I decline to give effect to such an informal communication. The relevant date under this first factor is the date that Defendants first sought to compel arbitration. (Def Reply at 6.) Defendants object that plaintiff Hahn agreed to move forward with discovery despite the possibility of arbitration. Of course, that makes sense, because Hahn is not the party who seeks to arbitrate. Nothing about her counsel's agreement to go forward with discovery prevented Defendants from seeking to compel arbitration.

Setting aside a two-month stay pending mediation, Defendants have given no credible reason why they did not file this motion sooner than January 2020.[3] The two-year period here is longer than those in *Nino*, *Gray Holdco*, and *Hoxworth*—cases in which the court found waiver—and this factor "weighs firmly" in favor of waiver. *Nino*, at 210.

### ii.     Extent to which Defendants contested the merits

No motion to dismiss was filed in this action.[4] The motion for summary judgment, filed simultaneously with this motion to compel arbitration, was Defendants' first motion disputing the merits of the case. (DE 71.) That said, the summary judgment motion is fully briefed; the cost of such a motion, whether measured in time or money, is at this point largely a sunk cost. Still, Defendants are in no position to complain.

Defendants, by letter, requested that any motion to compel arbitration be deferred until after a decision on the motion for summary judgment. A grant

---

[3]     Nor is the analysis altered by the Magistrate Judge's subsequent ruling denying leave to file until the completion of fact discovery. At that point, Judge Hammer was presented with a *fait accompli,* in the form of a case that had already been substantially litigated. Had a motion to compel arbitration been presented promptly, at the outset of the case, leave to file surely would have been granted, as is routine.

[4]     In noting this fact as a matter of procedural history, I imply no view as to whether such a motion would have been appropriate.

of summary judgment in Defendants' favor, they reasoned, would dispose of the matter and moot the arbitration that Defendants themselves are requesting. (DE 41.) The Court will not, however, permit a party to consent to "litigation, but only if I win." The entire foundation of the *Hoxworth* waiver procedure is that a party, at some reasonably early point, must choose. The Court's resources are limited, and are properly directed to controversies that will actually be litigated here. Parties are not free to trifle with the Court's processes in this manner.

### iii.   Alerting adversary to arbitration provision

This factor considers the time at which the Defendants informed their adversary of the right to pursue arbitration. The court will consider, for example, whether the party raised arbitration as a defense in its answer or initial pleading. *In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d 109, 1119 (3d Cir. 2012).

Defendants did not raise arbitration as a defense in their answer. The significance of that omission is only magnified by what Defendants did instead: They removed the case to this Court, signaling their intent to litigate it here.

In October 2018, a little over six months after the Complaint was filed, Defendants sent an email in response to a request for deposition dates, stating the following: "What about the arbitration issue? We may move to compel. Thanks." (Def. Brf. at Ex. B.) Plaintiff's counsel responded with the following: "Plaintiff does not agree to arbitration. Either way, whether it is court or arbitration, we will need the depositions, so please provide some availability for scheduling. Thank you." (*Id.*)

Defendants sent that email approximately six months after the Complaint was filed, although before any depositions were taken. The email raised only the possibility of arbitration, and the plaintiff responded clearly that she had no intention of consenting. Defendants did not follow through for another year and a half. *C.f. Spaeth v. Srinivasan*, 959 A.2d 290, 295 (App. Div. 2008) (declining to find waiver where six month delay in raising arbitration

could be attributed partly to defendant's *pro se* status and where defendant "acted thereafter in accordance with her intention to seek arbitration"). Though the email undoubtedly demonstrates that Defendants disclosed the prospect of arbitration, "the likelihood of arbitration diminishes the longer the case is litigated with no further indication that a motion to compel arbitration is forthcoming." *Nino*, at 211.

Had Defendants followed up on the email suggestion, or if Hahn had lulled them into thinking she would consent to arbitration, this factor might have more weight. Still, because Defendants were not wholly silent on the subject of arbitration, this factor might be seen to weigh very slightly against waiver.

### iv.   Extent of non-merits motion practice

Hahn filed a motion to compel discovery, which Defendants opposed, prior to Defendants' letter seeking leave to file a motion to compel. (DE 20, DE 23). This non-merits motion practice required Hahn to devote resources toward discovery disputes, which demonstrate the prejudice caused by Defendants' delay in moving to compel arbitration. Still, this factor "is not an absolute requirement," and the Third Circuit has found waiver "even where no significant non-merits motion practice occurred." *In re Pharmacy Ben, Managers Antitrust Lit.*, 700 F.3d at 119.

### v.   Acquiescence in pre-trial orders

Continuing to the fifth factor, I consider the parties' acquiescence in pre-trial orders. Generally, where the Third Circuit has found no waiver, the cases "were not litigated long enough to feature any acquiescence in pretrial orders." *Id.* (citing *Paine Webber*, 61 F.3d at 1065; *Gavlik*, 526 F.2d at 783–84. *But see Wood*, 207 F.3d at 680 (finding no waiver even where the court had already filed a joint discovery plan). Here, the parties participated in three case management conferences and were subject to four scheduling orders. (Pl. Brf., Ex. 2 at 10.) Defendants' long-term assent to Judge Hammer's pretrial orders weighs in favor of a finding of waiver.

10

### vi.   Extent of discovery

The sixth and final factor concerns the extent to which the parties have engaged in discovery. In general, cases finding waiver feature "significant discovery activity in the district court." *In re Pharmacy Ben. Managers Antitrust Lit.*, 700 F.3d at 120; *see, e.g.*, *Hoxworth*, 980 F.2d at 925–26 (finding waiver when the parties engaged in several depositions, answered several discovery requests, and litigated discovery disputes). Prior to Defendants' 2020 request to move to compel arbitration, the parties had conferred and proposed a joint discovery plan, served interrogatories and requests for documents, and held depositions of four witnesses. (DE 9; Pl. Brf., Ex. 2.)

### vii.   Weighing the Factors

This case has been before this Court since early 2018. Defendants did not seek to compel arbitration until two years into this litigation. That length of time weighs heavily in favor of waiver. While Defendants, via an email, did equivocally alert Hahn to the possibility of arbitration, even that did not occur until six months into the litigation. The parties have now completed discovery—which, prior to Defendants' request to move to compel arbitration included a motion to compel, the exchange of interrogatories and document requests, and four depositions. In the light of the above factors, I find that Defendants have waived their right to arbitration.

Defendants' motion to compel arbitration and dismiss this action is therefore denied.

## III.   Motion for Summary Judgment

Having found that Defendants have waived their right to arbitration, I will address Defendants' motion for summary judgment. Plaintiff has asserted claims for age discrimination under the New Jersey Law Against Discrimination ("NJLAD") against The RealReal (Count I) and Julie Wainwright, the Chief Executive Officer of the RealReal (Count II). Defendants now move for summary judgment on both counts.

11

### a.  Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment. *See id.*

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A party asserting that a fact [is not] genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents . . ., affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)). "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250-51.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F. 3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In that respect, the Court's role in deciding a motion for summary judgment is simply "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

### b. Count I

Hahn asserts a claim for age discrimination under the NJLAD against her employer, The RealReal. The NJLAD prohibits discrimination in the workplace based on "race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, familial status, liability for service in the Armed Forces of the United States, or nationality." N.J. Stat. Ann. § 10:5-3. As a starting point, courts typically have looked to federal cases arising under analogous provisions of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act. *Bergen Commer. Bank v. Sisler*, 723 A.2d 944, 949 (1999); *see also Waldron v. SL Indus., Inc.*, 849 F. Supp. 996, 1000 (D.N.J. 1994) ("Age discrimination claims under the LAD and the ADEA are governed by the same standards and burden of proof structures applicable under Title VII. . . .")

Hahn argues that she has put forth sufficient direct and circumstantial evidence of discrimination. In discrimination cases, courts generally evaluate motions for summary judgment under the specialized burden-shifting regime set out in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). If there is sufficient "direct evidence," however, the *McDonnell Douglas* burden-shifting analysis does not apply. *See, e.g., A.D.P. v. ExxonMobil Research and Engineering Co.*, 54 A.3d 813, 821–22 (App. Div. 2012) (explaining that in the

less common case in which there is direct evidence of discrimination, the
*McDonnell Douglas* analysis does not apply) (citing *Healey v. Southwood
Psychiatric Hosp.*, 78 F.3d 128, 131 (3d Cir. 1996)) (finding error in District
Court's application of *McDonnell Douglas* to case involving facially
discriminatory policy). As such, I will discuss Hahn's assertions of direct and
circumstantial evidence separately, though naturally some of the evidence is
overlapping.

### i.   Direct Evidence

Hahn argues that there is sufficient direct evidence of discrimination to
survive summary judgment. (Pl. SJ Brf. at 8.) In order to establish a direct
evidence age discrimination claim under the NJLAD, plaintiff has a "rigorous
burden" to demonstrate "that age, per se, was a substantial factor in an
adverse employment decision." *Geltzer v. Virtua West Jersey Health Systems*,
804 F.Supp.2d 241, 250 (D.N.J. 2011) (citing *Bergen Commer. Bank v. Sisler*,
723 A.2d 944 (1999)). "A plaintiff has presented direct evidence of
discrimination if the court determines that "a statement made by a
decisionmaker associated with the decisionmaking process actually bore on the
employment decision at issue and communicated proscribed animus." *Smith v.
Millville Rescue Squad*, 139 A.3d 1, 13 (N.J. 2016) (citing *McDevitt v. Bill Good
Builders, Inc.*, 175 N.J. 519, 528 (N.J. 2003)). Direct evidence is "not only a
hostility toward members of the employee's class, but also a direct causal
connection between that hostility and the challenged employment decision."
*Sisler*, 723 A.2d at 954. Where the evidence is direct, "the quality of evidence
required to survive a motion for summary judgment is that which if believed,
proves [the] existence of [a] fact in issue without inference or presumption." *Id.*
"[S]tatements by non-decisionmakers, statements by decisionmakers unrelated
to the contested employment decision, and other 'stray remarks'" do not

constitute direct evidence. *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 n. 2 (3d Cir. 2002).[5]

Hahn's purported direct evidence consists of statements made by Wainwright, The RealReal's founder, Chief Executive Officer, and Chairwoman of the Board (P SOMF ¶ 33.) The strongest such evidence is that Wainwright used the phrase "frumpy, middle-aged women" in relation to the HR team, and that she referred to the need for "fresh, young faces."

Wainwright herself testified that she used the phrase "frumpy middle-aged women" in conversation with Jean Barbagelata. Barbagelata, who was The RealReal's Vice President of People and Places (HR), hired Hahn, and Hahn initially reported to Barbagelata. Barbagelata herself reported to the company's Chief Financial Officer (not to Wainwright). (P SOMF ¶ 31.) Barbagelata left the company in May 2017.

Regarding the "frumpy" phrase, Wainwright testified as follows:

Q: Okay. Did you ever use the phrase "middle-aged women" with [Barbagelata]?

A: I did.

Q. Tell me about that.

A. Jean [Barbagelata] – there were many people she hired that were unprofessional in their dress and people would come to me and complain about the way HR was not professional.

Q. Okay.

A. And in that many phrases came up.

Q. What were those phrases?

---

[5]     If a plaintiff establishes discriminatory animus by direct evidence, the burden of persuasion shifts to the defendant to "produce evidence sufficient to show that it would have made the same decision if illegal bias had played no role in the employment decision." *Alalwan v. Rutgers Sch. of Dental Med.*, No. A-4983-18T1, 2020 WL 6140410, at *4 (N.J. Super. Ct. App. Div. Oct. 20, 2020), cert. denied, 244 A.3d 1207 (2021) (citing *Fleming v. Corr. Healthcare Sols., Inc.*, 164 N.J. 90, 101 (2000)). As I will find that Hahn has not asserted sufficient evidence of direct discrimination, I will not reach this second stage.

>    A. One of them was she – you know, "frumpy middle-aged women,"
>    but it was about their dress . . .

(Castronovo Cert., Ex. E (Wainwright Dep.) at 77:13-25.) Zubin Koshy, the
company's Director of Talent Acquisition, testified that he remembered
Wainwright using the phrase "frumpy middle-aged women." (Castronovo Cert.,
Ex. G (Koshy Dep.) at 11:11-12:7, 13:24-15:10.) Barbagelata testified that
Koshy had told her the comment was made in the context of not hiring any
more "frumpy middle-aged women," but Koshy could not recall the context of
the conversation and stated that Wainwright "never said anything about no
more hiring." (Barbagelata Dep. at 33:18-34:11; Koshy Dep. at 11:14-16; 12:4-
7.) Barbagelata also testified that Wainwright told her it was important to have
fresh young faces in outwardly facing positions such as recruiting and HR.
(Castronovo Cert., Ex. C (Barbagelata Dep.) at 36:4-37:4.) Wainwright testified
that she did not say this. (Wainwright Dep. at 85:22-86:1.)

Barbagelata was replaced by Elizabeth Taska, who held the position of
Senior Vice President of Human Resources. (SOMF ¶¶ 2, 5.) Unlike
Barbagelata, Taska reported directly to Wainwright. (P SOMF ¶ 33.) Shortly
after starting with The RealReal, Taska terminated Hahn. Taska testified that
Wainwright referred to Hahn as "like, a truck driver, overweight, sloppy, off
brand, didn't wear a bra, and that – she would refer to her in very derogatory,
physical description in terms of being – this was not who she wanted to
represent the company." (Taska Dep. at 40:6-16.) Taska also testified that
Wainwright would refer to older employees, including Hahn, as "off brand."
(Castronovo Cert., Ex. F (Taska Dep.) at 40:6-16, 42:7-12, 42:13-23.) In an
arbitration deposition for a separate case, Taska testified that Wainwright
referred to Hahn as having "long, hanging breasts." (Castronovo Cert., Ex. I at
190:2-19.)

On May 26, 2017, four days before Taska began her employment,
Wainwright emailed Taska indicating that changes in personnel might be in the
offing:

16

[The New Jersey team] will not be part of your solution moving forward and you will have a lot of latitude to build a team that wants to affect positive change at [The RealReal].

I will be surprised if there are more than 2 people that were here before in your organization this time next year.

(Castronovo Cert., Ex. J.)

Hahn asserts that this evidence establishes that "Wainwright discriminatorily considered Plaintiff's age in evaluating Hahn's role with Defendant [The Real Real].  Wainwright then advised her new hire and direct subordinate, Ms. Taska, that Plaintiff should not remain employed." (Pl. SJ Brf. at 13.) The cases Hahn cites in support, however, demonstrate that a showing of direct evidence requires a closer causal connection. In *Smith*, for example, the Supreme Court of New Jersey found sufficient allegations that the plaintiff was terminated because of his marital status where he alleged, *inter alia*, that his supervisor informed him he would not have been terminated if he and his wife had been able to reconcile. *Smith v. Millville Rescue Squad*, 139 A.3d 1, 15 (N.J. 2016). In *Myers*, the plaintiff's supervisor testified that she believed the plaintiff "may have been working harder if she hadn't had the illness," which the court found to be sufficient direct evidence of discrimination based on plaintiff's medical condition. *Myers v. AT & T*, 882 A.2d 961 (App. Div. 2005). In *McDevitt*, the president of a company nodded affirmatively when his secretary stated that the terminated employee was terminated because she was "too old." 816 A.2d at 164. The Supreme Court of New Jersey remanded the case, finding that the nod could qualify as direct evidence of age discrimination. *Id.*

On the other hand, in *Geltzer*, the plaintiff's interviewer told him "you really don't want to work full time, you are getting old," and the court found that this was not direct evidence of age discrimination. *Geltzer v. Virtua W. Jersey Health Sys.*, 804 F. Supp. 2d 241, 250 (D.N.J. 2011). In *Alalwan*, not even the statement "I hate Arabs," allegedly made by a supervisor with a role in the decision to terminate the plaintiff, sufficed to make out a direct-evidence claim. *Alalwan v. Rutgers Sch. of Dental Med.*, No. A-4983-18T1, 2020 WL

17

6140410, at *6 (N.J. Super. Ct. App. Div. Oct. 20, 2020), *certif. denied*, 245 N.J. 258, 244 A.3d 1207 (2021).

On this record, a permissible inference arises that Wainwright played a role in the decision to terminate Hahn. As CEO of the company, she wrote to Taska that Hahn "may not be part of the solution moving forward." Such statements of strategy or intent constitute more than "stray remarks." *See Grasso v. W. New York Bd. of Educ.*, 834 A.2d 1026, 1032 (App. Div. 2003) (observing "discriminatory comments made by one with input into the decision-making process are not stray remarks"). Still, her comments do not establish the requisite direct causal connection.

Even referring to Hahn as a "frumpy middle-aged woman" does not supply a sufficient causal connection to satisfy the "direct evidence" standard. It does not sufficiently establish that *Wainwright* caused Hahn to be fired *because* she viewed her as a "frumpy middle-aged woman." That comment was made to Jean Barbagelata, who at the time was Hahn's direct supervisor. However, it was Taska, not Barbagelata, who fired Hahn. Both the "frumpy middle-aged women" and the "fresh young faces" comments were made approximately eighteen months before Hahn was terminated. The comments were not made in the context of terminating anyone, let alone terminating Hahn in particular. The record evidence lacks a "direct causal connection between that hostility and the challenged employment decision." *Bergen Commercial Bank*, 157 N.J. at 207–08. However, the facts in the record provide evidence of pretext, which will be discussed in the following section.

### ii.   Circumstantial Evidence

The *McDonnell Douglas* framework, adopted from federal Title VII cases, applies where a plaintiff asserts an NJLAD claim that rests on circumstantial evidence of discrimination. *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1139 (N.J. 2005) (applying *McDonnell Douglas* test to NJLAD discrimination case); *Bergen Commercial Bank v. Sisler*, 723 A.2d 944, 954 (N.J. 1999) (same). Under that framework, a plaintiff "must first establish a prima facie case" that she

18

suffered retaliation or discrimination. *Moore v. Johnson*, No. CV 14-4171, 2016 WL 7408844, at *4 (D.N.J. Dec. 22, 2016), aff'd sub nom. *Moore v. Sec'y U.S. Dep't of Homeland Sec.*, 718 F. App'x 164 (3d Cir. 2017) (quoting *Thompson v. Bridgeton Bd. of Educ.*, 9 F. Supp. 3d 446, 454 (D.N.J. 2014)). Second, if the plaintiff establishes a prima facie case, "the burden then shifts to the employer to articulate a legitimate, nonretaliatory or nondiscriminatory reason for its actions." *Id.* (citing *Tourtellote v. Eli Lilly & Co.*, 636 Fed. Appx. 831, 842 (3d Cir. 2016)). Third, if the employer is able to articulate such a reason, "the burden then shifts back to the plaintiff to prove that the employer's nonretaliatory or nondiscriminatory explanation is merely a pretext for the discrimination or retaliation." *Id.*

### 1. Prima Facie case

At the outset, the plaintiff must make a prima facie claim of discrimination. *Zive*, 867 A.2d at 1139; *see Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). To make out a prima facie case, an age-discrimination plaintiff must show that (1) she is at least forty, (2) she is qualified for the job, (3) she suffered an adverse employment action, and (4) she was replaced by someone else "who was sufficiently younger so as to support an inference of a discriminatory motive." *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021) (citing *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015)).

First, Hahn was 48 years old at the time she was fired. (P SOMF ¶ 1.) Second, she held her position for approximately two years without any serious disciplinary problems. Third, she was terminated. Defendants dispute, however, that Hahn has satisfied the fourth element.

The fourth element is satisfied if Hahn was replaced by someone sufficiently younger. Hahn asserts that she was replaced by Briana Egorow, an employee 20 years younger than herself. (P SOMF ¶ 139.) Egorow was promoted to HR Manager for Secaucus, Hahn's prior role, on September 18, 2017—three months after Hahn was terminated. (P SOMF ¶¶ 140, 141.) Taska

testified that Egorow's promotion signified in effect that Hahn's eliminated position was quickly un-eliminated and filled by Egorow. (Taska Dep. at 83:5-84:20.) Egorow testified that her duties as HR Manager included many of Hahn's former duties, including serving as the first point of contact for employees in Secaucus and facilitating exit and applicant interviews. (Castronovo Cert., Ex. M (Egorow Dep.) at 25:4-8; 30:18-31:24, 34:16-36:14, 37:14-22; Castronovo Cert., Ex. B (Hahn Dep.) at 54:21-56:24, 70:12-71:10.) Carlos Zayas, an employee who worked with Hahn in the Secaucus warehouse, testified that after Hahn was terminated, he interacted with Egorow in the same way he had interacted with Hahn and considered Egorow to have replaced Hahn. (Castronovo Cert., Ex. O (Zayas Dep.) at 20:10-21.)

Defendants argue that Egorow absorbed only some of Hahn's duties and that Egorow's duties were different overall. (Def. SJ Reply at 7.) Defendants assert that the person hired for the newly created Director role, who was only two years younger than Hahn, inherited Hahn's management and corporate duties, and that Hahn's duties with respect to recruitment were assumed by others. (Def. SJ Brf. at 9-10.) As to Egorow's role, Taska testified that she "would not say it was the same role" and that it was "very different." (Taska Dep. at 90:3-9.) Taska explained some of the differing duties held by Hahn and Egorow, but acknowledged that Egorow "might have" conducted exit interviews, and that she conducted "day-to-day transaction components of HR." (Taska Dep. at 89:10-94:19.) Despite Taska's testimony, Hahn has provided enough evidence to create a genuine dispute of material fact as to whether Egorow replaced her.[6] Egorow was given Hahn's same title, and it is undisputed that

---

[6]     Defendants assert that Egorow's promotion three months after Hahn's termination is irrelevant absent evidence of discrimination at the time Hahn was terminated. (Def. SJ Reply at 6-7.) Hahn's evidence of pretext, discussed below, tends to provide such evidence. Regardless, Defendants' reliance on *Reed* is unconvincing. *See Reed v. Agilent Techs., Inc.*, 174 F. Supp. 2d 176, 190 (D. Del. 2001). *Reed* cites only to *Price Waterhouse*, which was discussing the "moment it was made" criteria in order to distinguish non-discriminatory reasons developed after the fact, not for the

she absorbed at least some of Hahn's duties. That dispute is sufficient at this stage to meet Hahn's prima facie burden. *See Zive*, 867 A.2d 1133 (noting that the burden for proving a prima facie case of discrimination is "rather modest") (quoting *Marzano v. Computer Sci. Corp.*, 91 F.3d 497, 508 (3d Cir. 1996)).

### 2. Proffered reason and pretext

Once a plaintiff establishes a prima facie case, the burden of production shifts to the defendant, which must articulate a legitimate, nondiscriminatory basis for the adverse employment action. *Zive*, 867 A.2d at 1140. Defendants assert that the decision to terminate Hahn was "made for legitimate business reasons in connection with a Company-wide reorganization of the human resources organization by Ms. Taska." (Def. SJ Brf. at 10.) Specifically, a director position was created, and Hahn's manager role was eliminated. (Def. SJ Brf. at 22, 13 n.3.)  That on its face is a legitimate reason for termination. *See, e.g., Young v. Hobart W. Grp.*, 897 A.2d 1063, 1069 (App. Div. 2005) (denying summary judgment where plaintiff's role was eliminated as a cost reduction measure).

The burden now returns to Hahn to demonstrate pretext. The employer is entitled to summary judgment if, after proffering a non-discriminatory reason for its decision, plaintiff cannot "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Zive*, 867 A.2d at 1144 (internal quotations omitted).

### a. Weaknesses in proffered reason

If the plaintiff relies on the first method (discrediting the defendant's proffered reasons), she faces a demanding standard: she must present evidence

---

proposition that a replacement from a non-protected class must be made immediately. *Id.*; *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989).

that allows a factfinder "reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes*, 32 F.3d at 764 (internal quotations and citations omitted). The plaintiff "must show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes,* 32 F.3d at 764; *accord El–Sioufi v. St. Peter's Univ. Hosp.*, 887 A.2d 1170, 1187 (App. Div. 2005) (NJLAD case, citing *Fuentes*).

Hahn argues that Defendants' reasons for termination have shifted throughout the litigation. (Pl. SJ Brf. at 22.) Defendants' invocation of a "company-wide reorganization," she says, appears for the first time in their summary judgment brief. (Pl. SJ Brf. at 22; Def. SJ Brf. at 12.) To counter the notion that there could have been a company-wide reorganization, Hahn argues that Wainwright would have had to approve such a reorganization, but that Wainwright simultaneously denies having approved Hahn's termination. However, while Wainwright did testify that she has been involved with reorganizations in the past, she specified that she was involved when a new department was added (Wainwright Dep. at 69:2-4), a description that seemingly does not apply to the circumstances of Hahn's termination. Wainwright's assertion that she did not approve Hahn's termination is therefore consistent with there having been a company-wide reorganization.

Hahn also disputes Defendants' proffered reasons based on Hahn's performance. Hahn cites to Taska's deposition, and the cited passages do speak of Hahn's allegedly poor performance, but they say nothing about its playing a role in her termination. (Taska Dep. at 97:11-98:25, 99:1-3.) Even so, these reasons are not inherently inconsistent. It is possible that the company reorganized and that Hahn, because of her performance, was not chosen for a

new role. (*See* Taska Dep. at 98-100 (explaining reasons Taska believed Hahn was not right for the director role).) However, Defendants' promotion of Egorow to (in Hahn's version) the same position held by Hahn casts doubt on Defendants' proffered reason for termination. That there was a reorganization which rendered Hahn's role obsolete is belied by the reinstitution of a similar position only three months later. Further, Hahn has also presented evidence from which a reasonable factfinder could infer that "an invidious discriminatory reason was more likely than not a motivating or determinative cause" of Defendants' actions. *Fuentes*, 32 F.3d at 764.

### b. Statements by Wainwright

The second method of demonstrating pretext is, if anything, more supportive of Hahn's case. This method provides that a plaintiff may "defeat summary judgment by pointing to evidence that indicates that the employer acted with discriminatory animus." *Burton v. Teleflex Inc.*, 707 F.3d 417, 430–31 (3d Cir. 2013) (citing *Fuentes*, 32 F.3d at 764). Hahn argues that Wainwright's animus affected Taska's decision to terminate Hahn. (Pl. SJ Brf. at 18.) District Courts in this circuit have acknowledged that a defendant may be liable under the NJLAD pursuant to such a "cat's paw" theory of unlawful discrimination. *Bowie v. Costco Wholesale Corp.*, No. 316CV5808, 2019 WL 3283045, at *10 (D.N.J. July 22, 2019); *Mason v. Se. Pa. Trans. Auth.*, 134 F. Supp. 3d 868, 873 (E.D. Pa. 2015). "Under this theory, an employer may be liable for employment discrimination if the source of illegal animus was not the final employment decision-maker but rather another employee whose animus proximately caused the adverse employment action at issue in the case." 134 F. Supp., at 873 (citing *McKenna v. City of Phila.*, 649 F.3d 171, 178 (3d Cir. 2011)). Essentially, "the argument is not quite that the decision makers invented a pretext for termination, but rather that they acted on the basis of a false premise because the information on which they relied was tainted by . . . animus." *Bowie*, 2019 WL 3283045, at *10.

Hahn points to statements made by Wainwright, many of which were included in the direct evidence analysis above, as evidence of Wainwright's discriminatory animus. Whether or not they constitute direct proof, they constitute circumstantial evidence of discriminatory animus. One such statement is that Wainwright referred to the HR team as "frumpy middle-aged women." (Wainwright Dep. at 77:13-25.) While "frumpy" may not inherently implicate age, in combination with "middle-aged" it surely does. Another statement to which Hahn cites is Barbagelata's testimony that Wainwright told her it was important to have "fresh young faces" in outwardly facing positions such as recruiting and HR. (Barbagelata Dep. at 36:4-37:4.) Again, Wainwright's statement directly connects age concerns with the team from which Hahn was terminated. Barbagelata also testified that in the fall of 2016 at an off-site meeting, when Barbagelata introduced the topic of succession planning, Wainwright commented about bringing in some "fresh blood" because no one on the leadership team was "getting any younger." (Barbagelata Dep. at 43:12-45:9.) While Barbagelata did not terminate Hahn, these statements still may be probative of Wainwright's animus.[7]

Taska, who terminated Hahn and reported directly to Wainwright, testified that Wainwright would refer to older employees, including Hahn, as "off brand." (Taska Dep. at 40:6-16, 42:7-12, 42:13-23.) She elaborated: "In my opinion, it was a pattern that [Wainwright] would see people who were—especially older women who were heavyset and say they were 'off brand,' be very demeaning to them, and in some instances, make fun of—of women." (Taska Dep. at 42:7-12.) Taska also testified that Wainwright made disparaging remarks about Hahn in each of the approximately six conversations they had about Hahn. (Taska Dep. at 64:2-17.) Taska testified that Wainwright referred

---

[7]    As explained above, Barbagelata hired Hahn and is who Hahn initially reported to. Barbagelata herself reported to the company's Chief Financial Officer. (P SOMF ¶ 31.) Barbagelata left the company in May 2017 and was replaced by Taska. (SOMF ¶¶ 2, 5.) Unlike Barbagelata, Taska reported directly to Wainwright.

to Hahn as "like, a truck driver, overweight, sloppy, off brand, didn't wear a bra, and that – she would refer to her in very derogatory, physical description terms of being – this was not who she wanted to represent the company." (Taska Dep. at 40:6-16.) In an arbitration deposition for a separate case, Taska testified that Wainwright referred to Hahn as having "long, hanging breasts," inferably a reference to the effects of aging. (Castronovo Cert., Ex. I at 190:2-19; Pl. SJ Brf. at 12 n.1, 24.) Although a fact-finder may ultimately disagree, these age-related comments provide some evidence of potential animus on Wainwright's part.

In addition to evidence of Wainwright's animus, there is evidence that Wainwright exerted influence over Taska: Wainwright was the CEO and Chairwoman of the Board of The RealReal (P SOMF ¶ 29), and Taska reported directly to Wainwright (P SOMF ¶¶ 33, 38.) Taska testified that she felt it was important that Wainwright be satisfied with her job performance. (Taska Dep. at 32:18-22.) There is also evidence that Wainwright exerted her influence over Taska specifically in relation to Hahn's termination. On May 26, 2017, four days before Taska began her employment, Wainwright emailed Taska as follows:

> [The New Jersey team] will not be part of your solution moving forward and you will have a lot of latitude to build a team that wants to affect positive change at TRR.

> I will be surprised if there are more than 2 people that were here before in your organization this time next year.

(Castronovo Cert., Ex. J.)

Taska testified that she would talk to Wainwright prior to removing a direct-report as a matter of course, and that she did so before terminating Hahn. (Taska Dep. at 79:10-80:16.) The day before Hahn was fired, Taska emailed Wainwright stating that her "aim is 1230 tomorrow for Cecile"; asked to use a "temp backfill" to oversee Recruitment; and noted she was interviewing candidates. (Castronovo Cert., Ex. K.) The next day, Taska sent Wainwright an email informing her of Hahn's termination, stating "Ugh. Glad it's over. Looking

forward to having good field HR." (Castronovo Cert., Ex. L.) Taska testified that she sent the email because "it was the conclusion of something she had spoken to [Wainwright] about." (Taska Dep. at 82:16-20.)

This evidence is sufficient, under a "cat's paw" analysis, to survive summary judgment. *Bowie*, 2019 WL 3283045, at *10 ("[A] subordinate bias claim requires the plaintiff to demonstrate a causal relationship between the subordinate's actions and the employment decision.") (quoting *Mason*, 134 F. Supp. 3d at 873). A reasonable juror could find Wainwright's comments probative of discriminatory animus and Wainwright's influence over Taska sufficient to have caused Hahn's termination for discriminatory reasons. Even putting aside the "cat's paw" framework, discriminatory comments made by one with input into the decision-making process are not properly viewed as mere stray remarks, and Hahn has put forth sufficient evidence to create at least a dispute as to whether Wainwright's ageist animus and influence figured into the decision to terminate Hahn. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001) (citing *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir. 2000)) (stating that "discriminatory comments . . . made by . . . those in a position to influence the decisionmaker" can be evidence of pretext). Further, Wainwright's comments could be considered relevant as probative of "managerial attitudes." *See Grasso*, 834 A.2d at 1032 (finding "stray remarks" can be evidence of managerial atmosphere and a possible discriminatory intent); *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997) (same).

Defendants argue that the fact that Taska was 52 years old and Wainwright was 60 years old at the time Hahn was fired weighs against a finding of pretext. (Def. SJ Brf. at 21-22.) Defendants also point out that the person hired to fill the Director position at the Secaucus warehouse that was created when Hahn's position was ostensibly eliminated was 46 years old and the person hired to fill a comparable position at the Brisbane warehouse was 63 years old. (Def. SJ Brf. at 22.)

"Courts have found discriminatory intent lacking where the decision-makers are over forty when the employment decision was made." *Young v. Hobart W. Grp.*, 897 A.2d 1063, 1070 (App. Div. 2005) (finding it relevant that both decision-makers were close in age to plaintiff). On the other hand, "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Castaneda v. Partida*, 430 U.S. 482, 499 (1977)). That observation gains some credence here, given the particular nature of this business and the perception that, at least for "outward facing" positions, only young employees were "on brand." To the extent any presumption against non-discrimination by same-class actors exists, I find that Hahn has overcome it by evidence suggesting that Wainwright nevertheless harbored some such discriminatory animus, including her comment about "frumpy middle-aged women." And while the ages of Wainwright, Taska, and recent hires may be relevant, the extent of such relevance is for a jury to decide.

The weaknesses in Defendants' proffered reasons—namely, that Hahn's position was eliminated in a reorganization, yet was reinstated shortly after she was dismissed—combined with the evidence of Wainwright's statements, are sufficient for Hahn to meet her burden in this third stage. *See e.g., Smith v. M&M Mgmt. Co.*, No. 17-7978, 2019 WL 1397401, at *12 (D.N.J. Mar. 28, 2019) (denying summary judgment on NJLAD age discrimination claim after concluding that supervisor's single instance of calling employee a "dinosaur" was evidence of discrimination). Count I therefore survives summary judgment. *See Graham v. Univ. Radiology Grp.*, No. 3:18-cv-8616-BRM-DEA, 2020 WL 5640705, at *36 (D.N.J. Sep. 22, 2020) (stating that "when each side meets its burden at each stage of the *McDonnell Douglas* analysis, summary judgment is inappropriate") (citing *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007).

Defendants' motion for summary judgment on Count I is **denied**.

### c. Aiding and Abetting Claim

Count II of Hahn's Complaint asserts an individual liability claim under the NJLAD against Wainwright. The NJLAD imposes liability on "employers," a defined term which would apply only to The RealReal. *See* N.J. Stat. Ann. § 10:5-12(e). But the NJLAD also makes it unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act." N.J. Stat. Ann. § 10:5-12(e). Aiding and abetting amounts to a mechanism for imposing personal liability based on a violation of the NJLAD. *See Cicchetti v. Morris Cnty. Sheriffs Office*, 194 N.J. 563, 947 A.2d 626, 645 (2008) ("individual liability of a supervisor for acts of discrimination or for creating or maintaining a hostile environment can . . . arise through the 'aiding and abetting' mechanism."). Cases interpreting the NJLAD have occasionally embraced the "awkward" theory that a supervisor can aid and abet, not only the conduct of another, but that supervisor's own acts of discrimination. *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 127 (3d Cir. 1999) (abrogated on other grounds); *Ivan v. County of Middlesex*, 595 F. Supp. 2d 425 (D.N.J. 2009). Therefore, a finding that Wainwright participated in the termination decision will not preclude a finding that she aided and abetted the termination.

In order to establish that an individual defendant is liable as an aider and abettor, a plaintiff must ultimately show: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Hurley*, 174 F.3d at 127 (internal citation and quotation marks omitted). Aiding and abetting "require[s] active and purposeful conduct." *Tarr*, 853 A.2d at 928-29. Simply having responsibility over employees and the workplace, or failing to protect an employee from discrimination, falls short of that standard. *Cicchetti*, 947 A.2d at 646.

Defendants first argue that Wainwright cannot be liable for aiding and abetting absent a finding that the company violated the NJLAD. (Def. SJ Brf. at 22.) Because I have found that Count I survives summary judgment, this argument drops out. Defendants next argue that Wainwright cannot be liable for aiding and abetting because such liability requires "active and purposeful" conduct by the individual. (Def. SJ Brf. at 22 (citing *Tarr v. Ciasulli*, 853 A.2d 921 (2004); *Cicchetti*, 947 A.2d 626).) Defendants assert that the evidence shows Taska, not Wainwright, was the decision maker regarding Hahn's termination, and that Wainwright relied on Taska to evaluate Hahn independently. (Def. SJ Brf. at 24.)

The extent of Wainwright's involvement in the termination and her influence over Taska's actions present questions of fact for a jury to resolve. Hahn has provided sufficient evidence from which a reasonable juror could conclude that Wainwright knowingly and substantially assisted in the allegedly wrongful termination. Wainwright made statements indicative of discriminatory intent, from which a juror could conclude that Wainwright was the motivating force behind the reorganization that eliminated Hahn. Taska, presented by Wainwright as the decision maker, testified that Wainwright made disparaging remarks about Hahn to her in each of the approximately six conversations about Hahn. (Taska Dep. at 64:2-17.) A juror might find that Wainwright, who was in authority, signaled via the May 26 email to Taska that she wanted and expected Hahn to be terminated. Further, a juror may find the emails surrounding Hahn's termination to be evidence of Wainwright's involvement in Hahn's termination. There is sufficient evidence in the record for Count II to survive summary judgment, and Defendants' motion as to Count II is therefore **denied**.

**IV.     CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss and motion for summary judgment are denied. An appropriate order accompanies this opinion. Dated: September 17, 2021

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**